# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| CONNIE ARNOLD, | ) | |
| | ) | Case No. 1:24-cv-201 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| CENTURION OF TENNESSEE, LLC, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Plaintiff, a Tennessee Department of Correction ("TDOC") prisoner housed in the Bledsoe County Correctional Complex ("BCCX"), filed a pro se complaint for violation of 42 U.S.C. § 1983 arising out of various incidents during his BCCX confinement (Doc. 1). For the reasons set forth below, this action will be **DISMISSED**, as the majority of Plaintiff's claims are untimely, and Plaintiff's only claims that may be timely fail to state a claim upon which relief may be granted.

## I.     STANDARD

Under the Prison Litigation Reform Act ("PLRA"), district courts must screen prisoner complaints and shall, at any time, *sua sponte* dismiss any claims that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g.,* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure to state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in Rule

12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive a PLRA review, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Formulaic and conclusory recitations of the elements of a claim do not state a plausible claim for relief. *Id.* at 681. Likewise, an allegation that does not raise a plaintiff's right to relief "above a speculative level" fails to state a plausible claim. *Twombly*, 550 U.S. at 570. However, courts liberally construe pro se pleadings and hold them to a less stringent standard than lawyer-drafted pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

A claim for violation of 42 U.S.C. § 1983 requires a plaintiff to establish that a person acting under color of state law deprived him a federal right. 42 U.S.C. § 1983.

## II.    ALLEGATIONS

Plaintiff first states that he seeks monetary damages and "declaratory and injunctive relief" due to "violation of his Constitutional rights secured by the First, Eighth, and Fourteenth Amendment[s]," as well as violation of his rights under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and Title VII (Doc. 11, at 1–2). Plaintiff then sets forth his substantive complaint allegations, which the Court previously summarized as follows:

> Plaintiff began seeking treatment for his eyes in early 2021 (Doc. 1, at 6). In February 2021, Defendant [Dr.] Bartek diagnosed him with glaucoma in his left eye and cataracts in his right eye and told Plaintiff that it was too early to take these conditions "out of [Plaintiff's] eyes" (*id.*).

> In August 2021, "Plaintiff began seeing black dots and shiny silver stars in both eyes" and began having pain in his eyes (*id.*). Plaintiff therefore signed up for sick call and saw Defendant [Dr.] Bartek approximately fourteen days later (*id.*). This Defendant ordered "Brimodine" for Plaintiff, and Defendants [Dr.] Samuel and [Nurse Practitioner] Tollett "ordered Dorzomalide and Latanoprost" for Plaintiff, but Plaintiff alleges that these medications contributed to him losing sight in his left eye (*id.* at 7).

Plaintiff also claims that Defendant "Dr. Milton Saloman ordered [the] wrong eye[]glasses and ordered the wrong eye drops" for Plaintiff (*id.*). Plaintiff claims that this "burn[ed] his right eye [and] . . . caused it to go blind also," which he characterizes as medical malpractice (*id.*).

In mid-December 2021, Plaintiff saw Defendant [Dr.] Bartek and told this Defendant that his eyesight and pain were worse and that "his eyes were so sore he couldn't even wipe the water running from both eyes" (*id.* at 8). Defendant [Dr.] Bartek stated that Plaintiff had "a real war going on in both of [his] eyes" and recommended that Plaintiff go to a TDOC special-needs facility so that an eye doctor in private practice could examine and treat Plaintiff (*id.*).

Three months later, which would have been March of 2022, a TDOC officer told Plaintiff to pack up to go to the special-needs facility (*id.*). But when Plaintiff arrived at the property room, a different TDOC officer told Plaintiff he could only bring two changes of clothes and limited hygiene items to the special-needs facility, and that he had thirty minutes to unpack and repack (*id.*). However, Plaintiff was unable to see his property well enough to timely comply with this directive, at which time unspecified officers took Plaintiff to medical to sign a refusal for medical treatment, for which he was charged ten dollars (*id.*).

The next day, Plaintiff sent an information request to the Warden and Assistant Warden to explain his involuntary refusal of the transfer to special needs (*id.* at 9). But "Centurion medical would not set another appointment with a private eye doctor" for Plaintiff despite his repeated requests (*id.*).

In September 2022, Plaintiff's eyesight had severely "waned" due to Defendant [Dr.] Bartek's deliberate indifference, and he was therefore sent to the special-needs facility to see "eye specialist Dr. Cast at Meharry Medical Center" (*id.*). Dr. Cast stated that he could fix Plaintiff's eyes and "would see [Plaintiff] again in a few weeks" (*id.*).

But on January 17, 2023, Dr. Cast told Plaintiff he would only repair Plaintiff's right eye and another doctor would repair Plaintiff's left eye (*id.*). Then, on January 24, 2023, Defendant [Dr.] Bartek told Plaintiff that the work on Plaintiff's right eye would be the only treatment Plaintiff would get in prison (*id.*). Plaintiff then asked Defendant [Dr.] Bartek why various Defendants had prescribed Plaintiff the wrong eye medication in a manner that contributed to Plaintiff losing sight in his left eye (*id.*). According to Plaintiff, some of the eye drops he was provided were not those ordered by the eye doctors, and "many of" them were out of date by two months, if not more (*id.* at 10). And Defendants [Dr.] Samuel and [Nurse Practitioner] Tollett have told Plaintiff that they ordered certain medications for Plaintiff "at the instructions of Defendant [Health Administrator] Kaitlin Campbell" (*id.*). However, "this deliberate indifference caused [Plaintiff] to lose 100% sight in his left eye, and . . . continuous injury [degrade] to [his] right eye" (*id.*).

3

At Plaintiff's last appointment with Defendant [Dr.] Bartek in January 2023, this Defendant told Plaintiff that he did not have time to deal with prisoners like Plaintiff, that Plaintiff had various injuries to his right eye that would cause him to go blind, and that these injuries were due to the food from the prison kitchen, which Plaintiff claims was "making li[ght] of the fact that [he] was about to go blind" (*id.*). Plaintiff also showed Defendant [Dr.] Bartek his unprescribed eyeglasses, and Defendant [Dr.] Bartek said that Defendants [Health Administrator] Campbell and [Health Manager] Sutton told this Defendant that they would not be using his services for Plaintiff any longer, and that he could not order Plaintiff a correct pair of glasses (*id.* at 11). Nevertheless, it appears that Plaintiff alleges that Defendant [Dr.] Bartek ordered prescription glasses for Plaintiff, but Plaintiff could not see anything when he put them on (*id.*). Thus, Plaintiff has been wearing used glasses from other inmates (*id.*).

On August 15, 2023, Plaintiff signed up for sick call and asked about other medications and his need to see an eye doctor, but his requests were denied (*id.*).

On April 20, 2023, Plaintiff signed up for sick call, at which point Defendant [Nurse Practitioner] Tollett removed Plaintiff "from the chronic care list" and stated that no one would see him for his eye problems per Defendants [Health Administrator] Campbell and [Health Manager] Sutton (*id.*). Also on April 20, 2023, Plaintiff "ask[ed] Defendant [Dr.] Samuel if he could get [Plaintiff] reclassed to [the special needs facility] where [Plaintiff] c[ould] receive the medical care for [his] eye problem and other medical needs . . . [,]" but Defendant [Dr.] Samuel refused to do this because Plaintiff refused to take ten pills (*id.*). Plaintiff asked what the pills were for, but Defendant [Dr.] Samuel told Plaintiff he did not need to know (*id.*).

On unspecified dates, Defendants [Health Administrator] Campbell, [Health Manager] Sutton, [Dr.] Samuel, and [Nurse Practitioner] Tollett retaliated against Plaintiff for his acts of filing grievances regarding getting the wrong medication and wrong glasses by refusing to provide him medical care (*id.*).

In January of 2020, Defendant [Dr.] Rich transferred Plaintiff to a medical center in Nashville due to swelling in his legs from varicose veins (*id.*). Plaintiff saw Dr. Adam Richter, who examined Plaintiff, said Plaintiff's condition was severe, said he was concerned with Plaintiff losing his feet if he did not get treatment, "voiced concern [regarding] how [Plaintiff] was even able to walk because of the swelling in [his] legs," and ordered Plaintiff wraps for his legs while showering (*id.* at 12). Dr. Richter recommended that BCCX set up and appointment for Plaintiff at a vein clinic, but as of August 28, 2023, Defendants [Health Administrator] Campbell, [Dr.] Rich, [Dr.] Samuel, and [Nurse Practitioner] Tollett had refused to order a transfer for Plaintiff, despite Plaintiff requesting to see a specialist (*id.*). Also, Defendant Mussard ordered medical to stop providing the leg wrap treatment in retaliation for Plaintiff filing grievances against medical (*id.*).

4

Plaintiff signed up for sick call on August 29, 2023, for continuous pain in his left hand, at which point he saw Defendants [Dr.] Rich, [Dr.] Samuel, and [Nurse Practitioner] Tollett, who "only laugh[ed] at him[,] . . . refused to offer him any medical treatment," and stated that they did not know what was wrong and did not have any medication to give him for his pain (*id.*).

According to Plaintiff, Defendant Centurion has a custom or policy of denying him medical care, Defendants [Dr.] Samuel and [Dr.] Rich continue to deny him a necessary surgery, and Defendant [Health Administrator] Campbell (1) is aware of Plaintiff's injuries and could address the denial of medical treatment but refuses to intervene and (2) has told Plaintiff to file grievances regarding his medical care complaints even though TDOC policy prohibits such grievances (*id.* at 12–13).

Plaintiff has sued Centurion, Warden Shawn Phillips, Warden Brett Cobble, Health Administrator Kaitlin Campbell, Dr. Emma Rich, Dr. Brian Samuel, Dr. Stephen Bartek, Health Manager Phyllis Sutton, Nurse Practitioner Nathan Tollett, Dr. Milton Salomon, and Nurse Jessica Mussard (*id.* at 1, 3–6). As relief, Plaintiff requests compensatory, declaratory, and injunctive relief (*id.* at 13–14).

(Doc. 8 , at 4–8).

## III.    ANALYSIS

For the reasons set forth below, most of Plaintiff's claims are untimely, and those that may be timely fail to state a claim for which relief may be granted.

### A.    Statute of Limitations

As the Court previously noted (Doc. 8, at 8), and as Plaintiff agrees in his response to that order (Doc. 9, at 1), Tennessee's one-year statute of limitations applies to Plaintiff's claims. *Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005) (noting that federal district courts apply a state's statute of limitations to § 1983 claims); Tenn. Code Ann. § 28-3-104(a)(1)(B) (setting forth one-year statute of limitations for § 1983 claims). Federal law governs when the statute begins to run. *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citations omitted). Under federal law, a § 1983 claim accrues when the plaintiff knows or should have known of the defendant's action underlying the claim

5

for relief, even though the effects of the defendant's action may continue, or may not even be felt, until later. *See Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980).

As the Court also previously noted, it is apparent from the face of the complaint that more than a year before Plaintiff filed his complaint on June 14, 2024, he knew of injuries resulting from (1) all his medical care claims except the medical claims arising from his sick calls that occurred on August 15 and 29, 2023, and (2) his retaliation claims. As set forth above, however, Plaintiff asserts that his claims that occurred before August 15, 2023, are part of a continuous pattern, such that he should be able to present evidence of them in this action (Doc. 9, at 1).

The Court liberally construes Plaintiff's response to the Court's order to assert that his untimely claims may still proceed herein based on the continuing violation doctrine. This doctrine allows a court to consider "all relevant violations 'including those that would otherwise be time[-]barred[.]'" *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007) (quoting *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003)), *cert. denied*, 540 U.S. 876 (2003)). Under § 1983, continuing violations are similar to hostile-work environment claims, in which the harm "cannot be said to occur on any particular day," and the individual incidents are not actionable on their own. *Goldsmith v. Sharrett*, 614 F. App'x 824, 829 (6th Cir. 2015) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). The continuing violation doctrine applies most frequently in the context of Title VII discrimination claims, but the Sixth Circuit has held that it may "rarely" apply in § 1983 actions. *Sharpe*, 319 F.3d at 266–67.

The Sixth Circuit has noted that there are two separate categories of claims to which the continuing violation doctrine may apply. *Brown v. Louisville-Jefferson Cnty. Metro Gov't*, 135 F.4th 1022, 1035 (6th Cir. 2025). The first category of continuing violation claims requires

6

"three components: 'wrongful conduct' that 'continue[d] after the precipitating event that began the pattern'; 'injury to the plaintiff' that 'continue[d] to accrue after that event'; and such 'further injury . . . hav[ing] been avoidable if the defendants had at any time ceased their wrongful conduct.'" *Id.* (quoting *Eidson*, 510 F.3d at 635 (citations omitted). While "continual ill effects from an original violation" are not actionable under this theory, "continual unlawful acts" are. *Id.* (quoting *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999)). "The second category of continuing violations exists when the defendant has committed several distinct acts of wrongdoing, and the cumulative effect of these acts amounted to a constitutional violation. But if the defendant's separate acts of wrongdoing are individually actionable, the continuing-violation doctrine does not apply." *Id.* (quoting *Howell v. Cox*, 758 F. App'x 480, 484 (6th Cir. 2018)) (other citations omitted).

Nothing in Plaintiff's complaint allows the Court to find that the continuing violation doctrine applies to Plaintiff's claims. To the contrary, the face of Plaintiff's complaint indicates that, more than a year before Plaintiff filed his complaint on June 14, 2024, Plaintiff knew of the allegedly unlawful actions underlying his claims, including his factual allegations that (1) Defendant Centurion would not schedule a specialist appointment for Plaintiff after the April 2023 incident in which he did not go to the special needs facility; (2) in 2021 and January 2023, certain Defendants prescribed Plaintiff improper eye medications and improper eye glasses, which Plaintiff claims was both retaliation and in violation of his constitutional right to medical care; (3) in January 2023, Defendants, including Dr. Bartek, Dr. Samuel, Health Administrator Campbell, and Health Manager Sutton, decided Plaintiff would not receive further treatment for his eyes, a decision about which Defendant Nurse Tollett specifically told Plaintiff on April 20, 2023; (4) also on April 20, 2023, Defendant Dr. Samuel refused Plaintiff's request to go the

7

special needs facility unless he took ten pills; and (4) after Dr. Richter's 2020 recommendations that Plaintiff see a vein specialist and have leg wraps, Defendant Nurse Mussard discontinued the wraps as retaliation, and various Defendants failed to send him to a vein specialist. And all these incidents were "discrete events . . . [that were] easily identifiable and separately actionable." *Norman v. Granson*, 2020 WL 3240900, at * 2 (6th Cir. Mar. 25, 2020) (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114–15). As such, the continuing violation doctrine does not excuse the untimeliness of these claims.

Moreover, other than Plaintiff's conclusory assertion that the Court should consider his claims arising out of incidents prior to August 15, 2023, as part of a continuous pattern (Doc. 9), Plaintiff has not come forward with any other reason the Court should find these claims are timely, despite the Court inviting him to do so (Doc. 8). Accordingly, the Court finds that all of Plaintiff's § 1983 claims arising out of incidents that occurred prior to August 15, 2023, are time-barred, and they are therefore **DISMISSED**.

The Court will now address Plaintiff's ADA, Rehabilitation Act, and Title VII claims, as well as his § 1983 claims arising out of incidents that occurred on August 15, 2023, and August 29, 2023. For the reasons set forth below, these claims fail to state a claim for which relief may be granted.

### B. ADA and Rehabilitation Act Claims

As set forth above, Plaintiff seeks relief under the ADA and the Rehabilitation Act [*Id.* at 1]. "Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act . . . claims brought under both statutes may be analyzed together." *Thompson v. Williamson Cnty,. Tennessee*, 219 F.3d 555, 557 n.3 (6th Cir. 2000). Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be

8

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity." 42 U.S.C. § 12132. The ADA defines a "public entity" as "any State or local government; [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

But "the ADA [does not] impose liability upon individuals." *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004) (citing 29 U.S.C. § 794(b)(RA); 42 U.S.C. § 12131(1)). Nor does it impose liability against private entities, like Defendant Centurion. *Vick v. CoreCivic*, 329 F. Supp. 3d 426, 441–42 (M.D. Tenn. 2018) (collecting cases).

As Plaintiff's ADA and Rehabilitation Act claims cannot proceed against any Defendant herein and Plaintiff has not set forth any facts from which the Court can plausibly infer that any Defendant discriminated against him due to a disability, these claims are **DISMISSED**.

### C. Title VII of the Civil Rights Act

Plaintiff also seeks relief under Title VII of the Civil Rights Act. To state such a claim, a plaintiff must demonstrate:

> (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective or preventative actions.

*Fullen v. City of Columbus*, 514 F. App'x 601, 606–07 (6th Cir. 2013) (citation omitted).

Plaintiff's amended complaint does not allow the Court to plausibly infer that he can satisfy any element of a Title VII claim, and this claim is therefore **DISMISSED.**

### D. August 15, 2023

Plaintiff additionally asserts that on August 15, 2023, he signed up for sick call and asked about other medications and his need to see an eye doctor, but his requests were denied (*id.* at

9

11).  Plaintiff, however, does not provide any facts indicating that any named Defendant was involved in this incident.  *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted).  Nor does he provide any facts about the medical issues underlying his August 15 request for these unspecified medications and to see any eye doctor.  And, as set forth above, all the related events in Plaintiff's complaint that preceded the August 15 denials of his requests were separately actionable events for which Plaintiff failed to timely seek relief, and to which the continuing violation doctrine does not apply.  For these reasons, Plaintiff's allegations regarding the sick call on August 15 fail to state a claim upon which relief may be granted under § 1983 as to any Defendant.

Additionally, however, even if the Court could liberally construe this allegation in Plaintiff's favor to assert that unspecified jail medical providers refused Plaintiff's requests for medications and to see an eye doctor on August 15 because of prior incidents regarding his eye issues in his complaint that he attributes to Defendants Dr. Bartek, Health Administrator Campbell, Health Manager Sutton, Nurse Practitioner Tollett, Dr. Samuel, and Dr. Rich, and disregards the fact that those prior incidents were separately actionable events for which Plaintiff's claims are time-barred, however, these allegations still fail to state a plausible claim for relief under § 1983.

The Eighth Amendment[1] "forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward [his] serious medical

---

[1] As Plaintiff is a convicted prisoner, https://foil.app.tn.gov/foil/details.jsp (last visited March 5, 2026), his claims fall under the Eighth Amendment.  *Coleman v. Hamilton Cnty. Bd. of Cnty. Commissioners*, 130 F.4th 593, 599 (6th Cir. 2025) ("Corrections officers must protect convicted

10

needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (internal quotation marks omitted). An Eighth Amendment claim for the denial of adequate medical treatment is composed of two parts: (1) an objective component, which requires a plaintiff to show a "sufficiently serious" medical need; and (2) a subjective component, which requires the plaintiff to show the defendants acted with "deliberate indifference" to that need. *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). The subjective prong of a deliberate indifference claim requires a plaintiff to show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

However, the fact that a prisoner might disagree with the adequacy of care he received does not implicate the Constitution. *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1996). This is because "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Id.* Thus, differences in the opinions of inmates and medical personnel regarding the appropriate treatment, even where the prisoner is misdiagnosed and therefore inadequately treated, is not enough to state a claim of deliberate indifference, as "[a] patient's disagreement with his physicians over the proper course

---

prisoners from harm under the Eighth Amendment, and they must protect pretrial detainees from harm under the Due Process Clause.") (citation omitted).

of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under §
1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017)*; Sanderfer v. Nichols*, 62 F.3d 151,
154–55 (6th Cir. 1995); *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir.
Apr. 4, 1997).  As the Supreme Court has explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to
> constitute an unnecessary and wanton infliction of pain or to be repugnant to the
> conscience of mankind.  Thus, a complaint that a physician has been negligent in
> diagnosing or treating a medical condition does not state a valid claim of medical
> mistreatment under the Eighth Amendment.  Medical malpractice does not
> become a constitutional violation merely because the victim is a prisoner.  In
> order to state a cognizable claim, a prisoner must allege acts or omissions
> sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105–06 (internal quotation marks omitted).

Liberally construing the complaint in Plaintiff's favor, it appears that Plaintiff alleges that
on August 15, unspecified individuals denied his requests for medication and to see an eye
doctor in accordance with previous events alleged in the complaint.  Specifically, Plaintiff
alleges that in September 2022, he saw an eye specialist, Dr. Cast, who stated that he could fix
Plaintiff's eyes and "would see [Plaintiff] again in a few weeks" (*id.* at 9).  But on January 17,
2023, Dr. Cast told Plaintiff he would only repair Plaintiff's right eye, and another doctor would
repair Plaintiff's left eye (*id.*).  Then, on January 24, 2023, Defendant Dr. Bartek told Plaintiff
that the work on Plaintiff's right eye would be the only treatment Plaintiff would get in prison,
that he did not have time to deal with prisoners like Plaintiff, that Plaintiff had various injuries to
his right eye that would cause him to go blind, and that these injuries were due to the food from
the prison kitchen, which Plaintiff claims was "making li[ght] of the fact that [he] was about to
go blind" (*id.*).

Subsequently, on April 20, 2023, Plaintiff signed up for sick call, at which point
Defendant Nurse Practitioner Tollett removed Plaintiff "from the chronic care list" and stated

12

that no one would see him for his eye problems per Defendants Health Administrator Campbell and Health Manager Sutton (*id.* at 11). Also on April 20, 2023, Plaintiff "ask[ed] Defendant [Dr.] Samuel if he could get [Plaintiff] reclassed to [the special needs facility] where [Plaintiff] c[ould] receive the medical care for [his] eye problem and other medical needs . . . [,]" but Defendant Dr. Samuel declined this request because Plaintiff refused to take ten pills (*id.*). Plaintiff asked what the pills were for, but Defendant Dr. Samuel told Plaintiff he did not need to know (*id.*). Plaintiff additionally generally states in his complaint that Defendants Dr. Samuel and Dr. Rich are denying him a necessary surgery, and Defendant Health Administrator Campbell is aware of Plaintiff's injuries and could address the denial of medical treatment but refuses to intervene (*id.* at 12–13).

Even assuming that Plaintiff seeks to have the Court consider all of these allegations in connection with the denial of his August 15 sick call requests for medications and to see an eye doctor, these facts do not allow the Court to plausibly infer that any Defendant has been deliberately indifferent to Plaintiff's eye issues. Specifically, it appears that, while Dr. Cast initially planned to address the issues in both of Plaintiff's eyes, Defendant Dr. Bartek later determined that only the issues in Plaintiff's right eye would be addressed while Plaintiff is in prison. No facts in the complaint suggest that Defendant Dr. Bartek's decision to only repair the issues in Plaintiff's right eye was due to deliberate indifference, rather than Defendant Dr. Bartek's medical judgment, and Plaintiff's disagreement with this decision does not assert a constitutional violation. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (finding that "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise independent medical judgment" (citation

omitted)).  Likewise, no facts suggest that Nurse Practitioner Tollett removed Plaintiff from the chronic care list on August 15 due to deliberate indifference, rather than medical judgment.

And while Plaintiff also alleges that Defendant Bartek stated that Plaintiff's issues with his right eye would eventually cause Plaintiff to go blind, it is apparent from the totality of Plaintiff's complaint that, at the time Defendant Dr. Bartek made this statement, Dr. Cast was either scheduled to perform a procedure intended to fix Plaintiff's right eye or had already performed that procedure.  And although this statement from Defendant Dr. Bartek indicates that he still believed Plaintiff would go blind in his right eye, this statement is not supported by any facts that would allow the Court to plausibly infer any deliberate indifference to Plaintiff's eye issues, rather than a medical judgment that no effective treatment remained to prevent this blindness.

In short, Plaintiff's factual allegations regarding his remaining eye issues indicate that after Defendant Dr. Bartek determined that Plaintiff's right eye procedure with Dr. Cast would be the last eye treatment he would receive while in prison, Defendants Health Administrator Campbell and Health Manager Sutton made Plaintiff's medical providers aware of this limitation.  And again, no facts in the complaint suggest that Defendant Dr. Bartek's decision that the procedure on Plaintiff's right eye would be the only procedure he would receive while in prison was a constitutional violation due to deliberate indifference, rather than a medical judgment, or that Defendant Nurse Practitioner Tollett's decision to take Plaintiff off the chronic care list was deliberate indifference, rather than medical judgment.  As such, the Court also cannot plausibly infer the denials of Plaintiff's requests for medications and medical assistance on August 15 rose to the level of deliberate indifference, especially as Plaintiff provides no facts about any of his medical issues underlying the requests.

14

Accordingly, Plaintiff does not "nudge[] [this claim] across the line from conceivable to plausible" as to any Defendant, *Twombly*, 550 U.S. at 570, and it is **DISMISSED**.

### E. August 29

Plaintiff next states that he signed up for sick call on August 29, 2023, for continuous pain in his left hand, at which point he saw Defendants Dr. Rich, Dr. Samuel, and Nurse Practitioner Tollett, who "only laugh[ed] at him[,] . . . refused to offer him any medical treatment," and stated that they did not know what was wrong and did not have any medication to give him for his pain (*id.* at 12).

Again, however, while Plaintiff alleges that he was having continuous pain in his left hand for which Defendants laughed at him and did not provide him treatment or pain medication, Plaintiff does not provide any facts suggesting that any doctor had diagnosed this hand pain, or that this condition was so obvious even a lay person could see that Plaintiff needed medical care, as required to plausibly allege that the hand pain was an objectively serious medical need. Nor does Plaintiff provide facts suggesting that these Defendants inferred that Plaintiff's hand pain was causing Plaintiff a substantial risk of harm, which they ignored, as required to plausibly allege the subjective element of this claim. To the contrary, it is apparent from Plaintiff's allegations regarding this incident that these Defendants did not find anything wrong with Plaintiff's hand and therefore did not see any reason to provide Plaintiff medical treatment or pain medication.

Accordingly, these allegations fail to allow the Court to plausibly infer a violation of Plaintiff's constitutional rights, and they are **DISMISSED**.

### IV. CONCLUSION

For the reasons set forth above:

1.      Even liberally construing the complaint in Plaintiff's favor, it fails to state a claim upon which relief may be granted under § 1983, and this action is therefore **DISMISSED** pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A; and

2.      The Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

_/s/ Travis R. McDonough_
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

16